STATE OF IOWA, Appellee, v. G. W. BIEWEN, Appellant.

HOMICIDE: Manslaughter—Gross Carelessness—Sufficiency of Evi-
1 dence. Evidence reviewed and held to sustain a conviction for
manslaughter in negligently driving an automobile over a child,
both as to the identity of defendant and the acts of negligence.

HOMICIDE: Manslaughter—Legal Intent Supplied by Recklessness
2 —Instructions. That element of intent necessary to support man-
slaughter *inheres* in conduct showing a reckless disregard and
indifference to the lives and safety of others, resulting in death.
Therefore where the court instructed that such recklessness must
be found before conviction could be returned, its further state-
ment that the law presumed an intent to kill from such reckless
conduct resulting in death was without any prejudice to de-
fendant.

CRIMINAL LAW: Trial—Argument Outside Record—Sustaining
3 Objections Thereto—Curing Error. Sustaining objections to im-
proper argument, and admonition to counsel to keep within the
record, with due caution to the jury either orally or generally
in the instructions, has large curative effect on such error.

CRIMINAL LAW: Trial—Argument—Allowable Limits—Matters of
4 Record. Counsel, even for the state, will be permitted to enter
upon and pursue such vigorous exercise of his vocabulary as may
seem to him meet in the promotion of his client's cause, even
though his ventures into the realm of oratory may take the form
of strong denunciation, so long as he confines himself to matters
of record and reasonable deductions therefrom. *Held*, counsel's
argument was allowable.

*Appeal from Keokuk District Court.*—HON. K. E. WILL-
COCKSON, Judge.

TUESDAY, FEBRUARY 23, 1915.

THE defendant was convicted of manslaughter and ap-
peals.—*Affirmed.*

*D. W. Hamilton* and *Wagner & Updegraff*, for appellant.

*George Cosson*, Attorney General, *C. C. Hamilton*, Coun-
ty Attorney, and *Talley & Hamilton*, for appellee.

LADD, J.—In the evening of August 16, 1913, Clarissa Hammes, a child nearly one year and six months old, was run over by an automobile and died in consequence of injuries received, the following morning. Her parents lived on the main traveled north and south highway between Harper and Richland. The mother was the only eyewitness and thus described what occurred:

1. HOMICIDE·
manslaughter:
gross careless-
ness: suffi-
ciency of evi-
dence.

"There is a lane between the house lot and the barn lot; she did not go with me in the barn lot, but stopped in the lane. I went to the barn lot to milk. I milked a cup of milk, took it to her, she sat in the lane drinking the milk. After I returned and was milking I saw an automobile coming north. Gus Biewen was in the car alone. I saw a car coming south a few minutes after it went north. I called for my girl and screamed. I saw her in the road right where it turned into our lane. I saw the car strike her, I was screaming at the time. From where I was when I first saw the car, I had gotten about half way to the fence when it struck her. I saw the child in the road at the time this car was going south, saw her when I raised up to look for her. The car bounced when it hit the child. I heard the car honk before it hit the child. I don't know who was in the car. I seen it was a car and that is all. I don't know whether there was two in the car or not, I didn't look. When I picked the child up, she was on the west side of the traveled road. I carried her to the well, threw cold water on her and then took her to the house and called for my husband. . . . She died about four o'clock in the morning of the 17th. She never regained consciousness. The car that came to the north was running pretty fast. I did not notice that it checked up. It was about seven o'clock. It was light. . . . The child had on a blue dress and nothing on its head. There was a dog with the child. A Scotch collie, it was yellow. It was about a year old. When I first looked up the dog was with her. I don't

know where the dog was after that. The dog was not as tall as she was. The dog was not in the habit of running out at cars, he would go out and bark but never followed a car."

Other evidence showed that the child was a head taller than the dog and could run. The highway was clear at the place of the collision and for a distance of 300 yards north and suitable for travel for a width of at least 30 feet. A short distance south the roads crossed and east of the corner a quarter of a mile and then south the same distance was defendant's home. In his service was Lloyd Dubois, living in a house a few rods farther on. The latter had been assisting Bombeis thresh on that day and testified that on his way home, at a point ten rods north of the corners last mentioned, he met defendant going north in his Ford automobile; that "he asked me how soon I would be ready to go down to Ollie. I said as soon as I could get my clothes changed and my team put up. I asked him where he was going. He said he was going up the road a mile or two. I let my team trot along. I went right home to where I lived. When I was unhitching my team, I saw him again standing on the north side of the team. That was the first I saw of him after I got home."

To the north of the place of the collision about a half mile is another road crossing and Bombeis' farm was about a quarter of a mile farther north and a like distance east of these corners. Dubois had left there between 6:30 and 7:00 o'clock P. M. Several parties examined the ground at these corners shortly afterwards and testified to recent car tracks indicating that an automobile coming from the south had turned there and returned to the south and Mrs. Hammes testified that she observed no car other than defendant's go north that evening and but the one going south. Dubois noticed none going either way other than defendant's and testified that he and defendant went to Ollie in the evening; that shortly after their return, defendant said to him that he believed he was in some trouble, that his wife said someone had

run over C. Hammes' little girl, that they said he did it, and
that he believed he would go there and wanted Dubois to go
with him. They did not go nor did defendant ever go there.
On the other hand, one Marr testified that at about the time
in question he was driving north with horse and buggy and
stopped at a place, probably defendant's, for a drink of
water; that when he went he saw an automobile going north
and met another going south a half or three quarters of a
mile north of Hammes' house and saw none turn in the road.
He had never been on this road before and was traveling from
Richland to Harper. The defendant's wife testified that he
reached home at about six o'clock P. M. and immediately took
her and their children for a ride and that they drove past
Hammes' house to the second crossroads north when they
turned and came back home and that he did not leave again
until he went to Ollie in the evening and was at home when
Dubois came from Bombeis' place. The defendant testified
that in returning from Sigourney he passed the Hammes'
home and took the ride as related by his wife; that a man,
presumably Marr, called for a drink of water and that he
did not pass along that road after taking the ride. He denied
meeting Dubois as related by the latter or mentioning trouble
to him though admitting the talk about going over to
Hammes'.

Such was the evidence set out somewhat in detail because
of the contention of counsel that it was insufficient to sustain
the conviction. The child was killed by an automobile being
driven with an unobstructed view and as there was no obsta-
cle to turning aside so as to avoid the collision, death might
well have been found to have been in consequence of the
recklessness of the driver. This was true whether the driver
observed the child or not, for if he did not see he should have
done so in the exercise of ordinary diligence. The slower he
was moving in such a situation the greater must have been his
carelessness. Counsel suggest that as the child was found

west of the center of the road, the driver's attention may have been distracted by the dog on the east side and the child in following the dog may have run out in front of the car. A sufficient response to this is the mother's testimony that the child was in the road in plain view. Moreover, the driver must have been aware of striking the child, and moving on without stopping or tendering assistance was a circumstance indicative of guilt on his part. The evidence was such that the jury was warranted in finding that the child's death was due to the recklessness of the driver of the automobile and the only remaining issue was the identity of the driver. As to this, the evidence was in conflict, and the arguments are directed. to which conclusion is more probable. This was for the jury to determine and their finding that defendant was driving the automobile at the time of the collision has such support as to preclude any interference from this court.

I. In the fifth instruction, the jury was told that the law implied an intent to kill from the reckless and careless acts causing death, "for the law presumes that every sane person intends the natural consequences of his voluntary acts." This may not have been technically accurate when applied to the charge of involuntary manslaughter, for negligence and reckless indifference to the lives and safety of others may supply the intent in that offense for the purposes of the criminal law. *State v. Moore*, 129 Iowa 514.

2. HOMICIDE: manslaughter: legal intent supplied by recklessness: instructions.

Other instructions exacted a finding in order to constitute manslaughter that death was caused by such negligence and indifference and this being so, what difference could it make with defendant whether intent were as a matter of law implied therefrom or whether the jury were told it was not essential? Not the slightest, for in either event no finding of fact was involved and the error, if any, was without the slightest prejudice.

II. Exception is taken to the closing argument by W. H. Hamilton to the jury. D. W. Hamilton for defendant had

suggested that counsel for the state would talk about the car

3. CRIMINAL
LAW: trial:
argument out-
side record:
sustaining ob-
jection there-
to: curing
error.

Marr saw going south being that of the physician who came from Harper to attend the child and that "the state of Iowa probably knows whether that was a one-seated or a two-seated car,"—Marr having testified that he thought the car he met was two-seated. Counsel for the state responded by quoting the above and then saying:

"Of course the State of Iowa knows that when the lawyers defending a criminal don't know it. The State of Iowa had used Dr. Adrian and sent him home and they knew it, but the State of Iowa has since found out some things and we are very sorry that Dr. Adrian's evidence is not before you on that subject."

Counsel for defendant objected to this "as improper argument and seeking to get matters in testimony that are not testified to." The court promptly sustained the objection and admonished counsel to keep within the record.

Counsel for state remarked that "whenever you touch a fellow in a sore spot he always squeals." An objection to this was sustained. The jury must have understood from the ruling on the objection and the admonition to counsel that such allusion was improper, and they were further guarded by the caution contained in the instructions to take into consideration only the evidence adduced. There was no prejudice.

The record does not show that other passages in argument now complained of were objected to at the time, but if they were these ought not to be held improper argument. The

4. CRIMINAL
LAW: trial:
argument:
allowable lim-
its: matters
of record.

language was strong; but if based on the facts of the case, courts ought not to cavil concerning the selection of words. In the course of argument, counsel for the state exclaimed: "If Gus Biewen ran over that little baby and crushed out its life; if Gus Biewen went on down the road and never stopped

to help that screaming mother; if his head is so thick that that did not make any impression upon him at all; if Gus Biewen after he heard of this never went near his neighbor, never expressed a word of sympathy or offered to turn a hand in their behalf; if this is the kind of a man Gus Biewen is, are you going to believe him and disbelieve Lloyd Dubois?'' This was not outside of the record but comment on what the evidence tended to prove.

Counsel for defendant had argued to the jury that nothing it could do, no verdict it might return could restore to the parents their little girl, and to this counsel for the state responded: ''What does she care, this little mother care, for her little girl is gone, you men cannot call it back, the sympathy of the defendant's attorney does not blot this grief out that this fellow in one criminal moment placed upon her heart. Go away with your sympathy. What she wants is that the man who killed that baby be brought to justice. But he is not satisfied in crushing the life out of this little babe, no, he must get upon the witness stand and say, 'Mrs. Hammes, you are swearing to what is not so, you are committing the crime of perjury when you say I went up that road north that day!' He is not satisfied with running over that little child and robbing this mother of its sweet presence, but he must make her out a liar and a perjurer in this court of justice. Go away with your sympathy, we want justice, gentlemen. 'Mrs. Hammes, you never saw me go up that road.' ''

The defense in the prosecution for crime has no claim to a monopoly on appeals to sentiment. The state is entitled to make response in kind and if the bounds of fair argument and legitimate inference from the facts are not transcended, the accused has no cause for complaint. Again counsel proceeded:

''Gentlemen, no, we can't bring back this little girl but here sit this concourse of people; here stands the State of

Iowa with its thousands of little children; here stands the people of this state and I in my feeble way am representing them. Society demands that men that wickedly run over little children in public roads must be punished. Why, gentlemen of the jury, I do not know how you feel, but if I was an owner of an automobile and I got so careless and reckless in driving it that I would run over my neighbor's baby in broad daylight and crush out its little life and rob its mother of its laughing presence and its sweet smile of its tender loving embrace—Oh, you don't know what he robbed that Mother of, you men don't, only a Mother can tell, only a Mother knows what is in that little woman's heart; if I had committed a crime like that and they would accuse me of it and upon investigation I had found that I had gone up past there and that I came back and that on my trip back that I must have run over that baby in a wicked and careless damnable moment, I would walk into this court house and go to this judge and say, 'Judge, I have done an awful wicked careless criminal act; I have robbed a poor mother of her little baby in a damnable careless moment, I can't restore the baby, I can't feel the aching of this mother's and father's heart; no, but I can take my punishment like a man, and for God's sake punish me, bind me in chains, lock me in a dungeon'!''

We may well assume that counsel for defendant had appealed to the jury in behalf of their client and had marshaled every fact and inference in his behalf, and we are not ready to say that it is improper practice for the state to meet them with argument of like character. ''Within reasonable limits, the language of counsel in argument is privileged, and he is permitted to express his own ideas in his own way, so long as they may fairly be considered relevant to the case which has been made. No lawyer has the right to misrepresent or misstate the testimony. On the other hand, he is not required to forego all the embellishments of oratory, or to leave

uncultivated the fertile field of fancy. It is his time-honored privilege to

" 'Drown the stage in tears.
Make mad the guilty and appal the free,
Confound the ignorant, and amaze, indeed,
The very faculties of eyes and ears.'

"Stored away in the property room of the profession are moving pictures in infinite variety, from which every lawyer is expected to freely draw on all proper occasions. They give zest and point to the declamation, relieve the tediousness of the juror's duties and please the audience, but are not often effective in securing unjust verdicts." *State v. Burns,* 119 Iowa 663.

This sufficiently answers the criticisms urged, but we may add that the decisions cited by appellant are not in point, for that the arguments condemned in these allude to matters outside of the record. Others may be found declaring what counsel or others would or should have done under similar circumstances. See *State v. Proctor,* 86 Iowa 698. Here state's attorney merely suggested a plea of guilty to be the proper course in such a case if one were guilty, though this was expressed in eloquent phrase. We are of opinion that there was not a departure from the domain of fair argument and the judgment is—*Affirmed.*

DEEMER, C. J., GAYNOR and SALINGER, JJ., concur.